UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MYRNA WILLIAMS**<br><br>     **Plaintiff,**<br><br>          v.<br><br>**VERIZON NEW JERSEY, INC., et al,**<br><br>     **Defendants.** | Civ. No. 2:19-09350 (KM-SCM)<br><br>**OPINION** |

**MCNULTY, U.S.D.J.:**

Plaintiff Myrna Williams is an employee of Defendant Verizon New Jersey ("Verizon"). (1AC ¶ 4 (DE 1)).[1] She has raised a variety of statutory and common law claims against her employer relating to alleged discrimination on the basis of her race, which is African-American. Currently before the Court is the motion of Defendant Verizon to dismiss Plaintiff's first amended complaint in its entirety. (DE 17).

I make a few observations at the outset.

First, the court strongly discourages "kitchen-sink" or "form book" pleading. The amended complaint purports to assert some twenty-two separate claims. Some are not causes of action at all; many plaintiff's counsel has not even attempted to defend in response to defendant's motion. The same held true for an amended complaint in another case filed by the same counsel

---

[1]     Citations to certain record items will be abbreviated as follows:

DE = Docket entry number

1AC = First Amended Complaint (DE 14)

Def. Brf. = Verizon's Motion to Dismiss Plaintiff's 1AC (DE 17)

Pl. Brf. = Plaintiffs' Brief in Opposition (DE 22)

Def. Reply = Verizon's Reply Brief on Motion to Dismiss (DE 23)

against Verizon. *Powell v. Verizon,* Civ. No. 19-4818 (D.N.J.).[2] My reasoning is set forth in somewhat more detail in an opinion filed in that action as Docket Entry 43.

Second, for the most part the federal laws invoked here do not address general unpleasantness, even perpetrated by management, let alone by co-workers. What is generally required is an allegation of discrimination by the employer on a prohibited basis, such as race or gender.

Third, I note that many of the grounds for dismissal relate to the statute of limitations or failure to exhaust administrative remedies. These are legal bars to the assertion of certain claims, no matter how meritorious. The discussion herein, therefore, should not be taken to express any opinion on the theoretical viability of certain factual allegations regarding events, however serious, that took place as long as eleven years ago.

For the reasons set forth in more detail below, Verizon's motion is granted in part and denied in part.

## I.   FACTUAL BACKGROUND

In considering a motion to dismiss, the Court is required to treat the facts alleged in the complaint as true and to draw all reasonable inferences in the plaintiffs' favor. I summarize those allegations as follows:

Plaintiff Myrna Williams is a woman of African descent, originally from St. Lucia. (1AC ¶ 1). She has been a full-time employee of Defendant Verizon since 1989, holding a variety of job titles and responsibilities. (*Id.* ¶ 4). Williams's career at Verizon was productive and fulfilling until 2007. (*Id.* ¶ 6). At that point, however, Williams began to experience ongoing and pervasive harassment. (*Id.* ¶ 8).

---

[2]       Of course, a party may assert as many claims as it has. But if a claim is not worth defending at the initial, motion-to-dismiss stage, then it probably was not worth asserting in the first place. Counsel are encouraged to exercise some selectivity at the outset, to avoid unnecessary expenditure of time and resources by adversaries and an already-overburdened court.

The first incident occurred in 2008, eleven years before the filing of the complaint. At that time, Williams was allegedly denied a personal day off for Martin Luther King Day by her new supervisor, LaVerne Francis. (*Id.* ¶¶ 7,10). She brought the issue up to her manager, Salvatore Lobue. (*Id.* ¶ 11). Lobue, however, did not assist her, and in fact would often overlook complaints from workers in Verizon's predominantly African American Newark office, while promptly assisting workers in Verizon's predominantly Caucasian Mt. Laurel office. (*Id.*). Williams sought intervention from her union. (*Id.* ¶ 12). Afterwards, Ms. Francis retaliated against Williams by acting in a spiteful and petty manner, for example by requesting she resubmit previously completed assignments. (*Id.* ¶ 12).

In an effort to obtain mediation of the dispute, Williams began copying her manager, Lobue, on correspondence between herself and Ms. Francis. (*Id.* ¶ 13). Rather than taking action to solve the problem, Lobue compounded the harassment by passing over Williams's department for overtime work. (*Id.*). Plaintiff ultimately sought and received redress through union arbitration. (*Id.* ¶ 14). Nonetheless, the problem of harassment continued. (*Id.* ¶ 15).

In 2009, Plaintiff was transferred to Verizon's East Brunswick office along with three other African American employees. (*Id.* ¶¶ 16-17). Williams and other African American employees were treated differently from the Caucasian employees in East Brunswick. (*Id.* ¶ 17). One example of such disparate treatment was that Plaintiff was denied a personal day to attend the funeral of her deceased aunt, while Caucasian employees were granted leave under similar circumstances. (*Id.* ¶ 18). Another is that an African American co-worker was punished for often arriving to work late in East Brunswick because she did not own a vehicle. Later, when the whole office was transferred to Newark, Caucasian workers traveling to Newark were granted accommodations for their disrupted travel. (*Id.* ¶ 19).

At the East Brunswick office, Williams also had a tense relationship with her new supervisor, Cherisse Rheubottom-Wilson. (*Id.* ¶ 20). This supervisor,

along with a subordinate, Judith Britt, teamed up to harass Williams. (*Id.* ¶ 23). Harassment included threatening Plaintiff with suspension for stepping away from her desk to deal with a medical condition; barging into the restroom to demand she immediately join a meeting; yelling at Plaintiff from across the office in order to humiliate her; and using Plaintiff's annual review as an excuse to antagonize her and accuse her of attacking Britt. (*Id.* ¶¶ 23-24).

Williams's attempts to seek help from Verizon's human resources department were ignored. (*Id.* ¶ 24). Indeed, her reports earned her a reputation as a troublemaker, and she continued to be denied overtime opportunities and time off. (*Id.* ¶ 25).

Rheubottom-Wilson and Britt left the company at some unspecified time. Williams's circumstances did not improve, however, since two new coworkers arrived and continued to harass her. Defendants Tina Kalfin and Tara Finnegan were placed in workstations next to that of Williams. (*Id.* ¶ 27). These individuals were generally antagonistic to everyone in the office—for example, they referred to the new manager as "That Bitch." Their insults, however, often took a racial form. (*Id.* ¶ 28). The two would openly comment on racially charged current affairs; they made light of police shootings involving African Americans; they expressed satisfaction that Bill Cosby, an African American, had been arrested; and they wore "hoodie" sweatshirts to work shortly after a fatal shooting of an African American boy who had been wearing a hoodie at the time. (*Id.* ¶¶ 29, 30).

On one occasion, after Williams asked Kalfin to lower the volume on her radio, Kalfin and Finnegan refused to speak to her. (*Id.* ¶ 31). Another time, Finnegan hovered behind Williams while she was working, and when Williams noticed what she was doing, Finnegan started an argument which ended with her screaming at Williams and calling her a "witch." (*Id.* ¶ 32). Following this incident, the two continued harassing Williams with witch-themed insults; they placed a witch doll on their work desk facing Williams, and Finnegan came to work in a t-shirt labeled "You Witch." (*Id.* ¶ 33). While this antagonism was not

explicitly racial in content, Plaintiff alleges that it came about because Kalfin and Finnegan disliked Williams for racial reasons. (*Id.*).

Williams's pleas to Verizon's human resources to remedy this harassment went unanswered. (*Id.* ¶ 35). After overhearing Kalfin and Finnegan planning to get her fired, Williams attempted to complain to the "Verizon Vice President." (*Id.* ¶ 36). Upon her return from a sick day, Williams found on her a desk a picture of a rat with its hands up. (*Id.* ¶ 37). Kalfin and Finnegan began referring to Williams as a "rat" and reminded her to "keep your hands up," which she took as a reference to the contemporaneous police shooting of Michael Brown, an African American. (*Id.* ¶ 37). Then, during the holidays, Kalfin and Finnegan placed a partially inflated reindeer with a wreath around its neck among the Christmas decorations. (*Id.* ¶ 38). The reindeer was kept partially deflated, which made it appear as if it were choking on the wreath, similar to hanging by a noose. (*Id.*). Additionally, the pair used tape to create an outline of a dead rat on the ground, evoking a chalk outline at a murder scene. (*Id.* ¶ 38).

Eventually, the Verizon Human Resources department responded to Williams regarding these "decorations," reporting that it had discovered no evidence of any violations of Verizon's code of business conduct. (*Id.* ¶ 39). That determination upset Williams to the point that she was unable to sleep that night and suffered from migraine headaches the next day, resulting in the paramedics arriving and taking her to the hospital. (*Id.* ¶ 40). The workplace stress and harassment led to additional health issues which required her to take off from work from April to June 2015. (*Id.* ¶ 41).

Upon returning to work in June 2015, Williams was moved to a different workspace and given a new assignment. (*Id.* ¶ 42). A Verizon "Department President" came to the office during this time and, during a meeting, commended Williams for dealing with such difficult co-workers. (*Id.*). The Department President stated during this meeting that Verizon's "employee

screening" around 1998 was "insufficient due to conducting a mass hire." (*Id.*). (The co-workers hostile to Williams had been hired around that time.) (*Id.*).

In October of 2016, Williams was transferred to the Livingston call center. (*Id.* ¶ 43). In December of 2016, she was rewarded for excellent work by being transferred to a dispatch center. (*Id.* ¶ 43). Here, Williams endured harassment by two co-workers named "Missy" and "Debbie." (*Id.* ¶ 44). They constantly informed Williams of their dislike of "foreigners taking Americans' jobs and accused her of 'sending money back to your home country.'" (*Id.*). Williams's attempts to bring up these issues to a supervisor were ignored. (*Id.*). Williams also attempted to raise concerns during staff meetings, but was criticized by Missy as being the only one complaining. (*Id.*). Williams again tried to stand up for herself during a staff meeting, causing Missy to shout at her and call her "evil" and "a bitch." (*Id.* ¶ 45). Management, although present, made no effort to intervene. (*Id.*).

Williams claims that the harassment is ongoing and that Verizon has pursued a policy or pattern and practice of hiring unfit managers who allowed employees to openly harass her. (*Id.* ¶¶ 46-47). She asserts a variety of causes of action, ranging from federal and state statutory violations to common law claims, against Verizon. The claims are also directed against several of the harassing employees in their individual capacities.

## II.   PROCEDURAL HISTORY

Plaintiff filed her complaint in this action on April 5, 2019. (DE 1). Verizon first filed a motion to dismiss on June 20, 2019. (DE 11). On June 28, 2019, Plaintiff filed the first amended complaint, which asserts the following twenty-two causes of action:

1. Race-Based Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)

2. Race-Based Discrimination in Violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12

3. Race-Based Discrimination (Hostile Work Environment) in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)

4. Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)

5. Race-Based Discrimination (Disparate Treatment) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

6. Race-Based Discrimination (Hostile Work Environment) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

7. Race-Based Discrimination (Retaliation) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

8. Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985

9. Violation of the Americans with Disabilities Act

10. Invasion of Privacy

11. Intentional Infliction of Emotional Distress

12. Negligent Infliction of Emotional Distress

13. Negligent Hiring

14. Negligent Supervision

15. Negligent Retention

16. Vicarious Liability

17. Respondeat Superior

18. Ratification

19. Failure to Warn/Misrepresentation

20. Gross Negligence

21. Civil Conspiracy of Verizon Employees, its Members and Associated, and Verizon

22. Punitive Damages

(1AC, DE 14).

Verizon filed this motion to dismiss on July 26, 2019. (DE 17). Plaintiff filed an opposition (DE 22), to which Verizon replied (DE 23). For the following reasons, Verizon's motion to dismiss the first amended complaint is granted in part and denied in part.

## III. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

When deciding a motion to dismiss, a court typically does not consider matters outside the pleadings. However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to

dismiss if the plaintiff's claims are based on the document." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis and citations omitted); *see In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). In that regard, courts may consider matters of public record and exhibits attached to the complaint. *Schmidt*, 770 F.3d at 249 ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record"); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009) (court may consider documents referenced in complaint that are essential to plaintiff's claim). That exception rests on the rationale that "[w]hen a complaint relies on a document . . . the plaintiff obviously is on notice of the contents the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993).

## IV.    ANALYSIS

Section IV.1 discusses arguments relating to the exhaustion of administrative remedies with respect to Plaintiff's Title VII and ADA claims. Section IV.2 discusses whether her NJLAD claim and § 1981 disparate treatment claim are barred by the relevant statutes of limitations. Sections IV.3 and IV.4 consider whether Plaintiff has stated a claim under other § 1981 theories. Section IV.5 discusses Plaintiff's conspiracy claim under 42 U.S.C § 1985(3). Section IV.6 covers a variety of common law theories of liability.

### 1.  Exhaustion of Administrative Remedies: Counts 1, 3, 4, and 9

Verizon asserts that Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e3(a) ("Title VII") and the Americans with Disabilities Act ("ADA") ought to be dismissed because Plaintiff has not exhausted her administrative remedies. Because it requires consideration of extrinsic materials, I must deny it in its current form as a

motion to dismiss. I will, however, authorize Verizon to file an early motion for summary judgment, confined to the exhaustion issue.

Prior to commencing a Title VII action in court, the employee must first file a charge with the Equal Employment Opportunity Commission ("EEOC"). *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019). Once the EEOC has received the charge, it notifies the employer and investigates the allegations, first pursuing informal methods of resolution and then being given the option of bringing suit against the employer itself. *Id.* at 1846-1847.

> In the event that the EEOC determines there is "n[o] reasonable cause to believe that the charge is true," the Commission is to dismiss the charge and notify the complainant of his or her right to sue in court. 42 U.S.C. § 2000e–5(b), f(1); 29 CFR § 1601.28. Whether or not the EEOC acts on the charge, a complainant is entitled to a "right-to-sue" notice 180 days after the charge is filed. § 2000e–5(f)(1); 29 CFR § 1601.28. And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer. § 2000e–5(f)(1).

*Id.* at 1847.

These procedures are mandatory and must be followed before bringing a private suit. *See id.* at 1851-1852 (noting that the claim-processing requirement was mandatory, though potentially subject to forfeiture as a defense if not timely raised). After filing the charge, and before filing suit, the complainant "must allow a minimum of 180 days for the EEOC investigation to proceed." *Burgh v. Borough Council of Borough of Montrose*, 251 F. 3d 465, 470 (3d Cir. 2001). If the EEOC decides not to pursue the matter further, it will notify the complainant, typically by means of a right-to-sue letter. "The receipt of the right-to-sue letter indicates that a complainant has exhausted administrative remedies, an essential element for bringing a claim in court under Title VII." *Id.* "A complainant may not bring a Title VII suit without having first received a right to sue letter." *Id.*

The same process is required for ADA claims. *See Williams v. East Orange Community Charter School*, 396 F. App'x 895, 897 (3d Cir. 2010) (citing 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a)).

Ordinarily, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last discriminatory act. 42 U.S.C. § 2000e-5(e)(1). If, however, the plaintiff first institutes proceedings with a "State or local agency with authority to grant or seek relief from such practice," that 180-day limitations period is extended to 300 days. *Id.*

Any lawsuit resulting from the filing of an EEOC charge is limited to claims that are within the scope of that initial administrative charge. *Barzanty v. Verizon PA, Inc.*, 361 F App'x 411, 413-414 (3d Cir. 2010) (citing *Antol v. Perry*, 82 F. 3d 1291, 1296 (3d Cir. 1996)). Claims not reasonably within the scope of the administrative charge will not be deemed exhausted.[3]

The complaint alleges that Plaintiff "filed a claim with the EEOC on June 26, 2019." (1AC ¶ 48). In its motion to dismiss, Verizon asserted that Plaintiff's Title VII and ADA claims should nevertheless be dismissed on exhaustion grounds, because she had not received a right-to-sue letter. (Def. Brf. at 10). Plaintiff responded that exhaustion is an affirmative defense, requiring citation of extrinsic evidence, which therefore cannot be considered within the bounds of a motion to dismiss. (Pl. Opp. at 17). To its reply brief, Verizon has attached what appears to be a copy of Williams's initial charge with the EEOC and a dismissal of that charge. For the first time, however, Verizon's reply brief also argues that the claims in this lawsuit fall outside the scope of Williams's EEOC charge, and therefore remain unexhausted. (Def. Reply at 7-10; Exh. A, Exh. B).

Plaintiff has not had an opportunity to respond to Verizon's contentions. I will not decide such an issue based on documents appended to a brief, and a reply brief at that. I will therefore deny the motion to dismiss the Title VII and ADA claims on grounds of nonexhaustion.

---

[3]    The exhaustion requirement and the statute of limitations requirement are, of course, interrelated. If a claim has not been filed at all, then it has not been filed timely.

I will, however, authorize Verizon to file a focused motion for summary judgment, confined to the issue of exhaustion of administrative remedies as to Counts 1, 3, 4, and 9. The facts necessary for a response should be within plaintiff's control. To the extent Counts 1, 3, 4, and 9 may survive the exhaustion analysis, Verizon's motion may, in the alternative, reassert the other grounds for dismissal of those counts that it asserts here. Verizon may do so by incorporation of its arguments on this motion to dismiss; plaintiff may likewise incorporate by reference her arguments in opposition to this motion to dismiss.

For the meantime, however, Verizon's motion to dismiss on exhaustion grounds is denied as to Counts 1, 3, 4, and 9. Pending resolution of that threshold issue, I do not reach Verizon's other arguments for dismissal of those counts.

### 2. NJLAD and § 1981 claims (disparate treatment): Counts 2 and 5

Verizon argues that Count 2, Plaintiff's discrimination claim under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12, is barred by the applicable two-year statute of limitations. It argues that Count 5, the disparate treatment claim under 42 U.S.C. § 1981, is barred by the applicable four-year statute of limitations.

a. *Standards: NJLAD, § 1981, and adverse employment actions*

I first quickly review the essential elements of the NJLAD and § 1981 claims. In NJLAD actions for employment discrimination, courts generally follow Title VII precedent. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) ("This Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD ....") (citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 249 (3d Cir. 2006)). The elements of a § 1981 discrimination claim likewise parallel those of a Title VII claim. *Schurr v. Resorts Intern. Hotel, Inc.*, 196 F. 3d 496, 499 (3d Cir. 1999) (quotation omitted). Title VII, in turn, "prohibits discriminatory employment practices

based upon an individual's race, color, religion, sex, or national origin." *Shahin v. Delaware*, 424 F. App'x 90, 92–93 (3d Cir. 2011) (citations omitted).

Title VII claims (and, by extension, NJLAD and § 1981 claims) of racially based employment discrimination require a plaintiff to allege as a *prima facie* case that "1) she belongs to a protected class; 2) she was qualified for the position; 3) she was subject to an adverse employment action; and 4) the adverse action [occurred] under circumstances giving rise to an inference of discrimination." *Shahin*, 424 F. App'x at 92–93 (citing *Sarullo v. U.S. Postal Serv.*, 352 F. 3d 789, 797 (3d Cir. 2003); *see also Tourtellotte*, 636 F. App'x at 842 (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981)). If the plaintiff establishes a *prima facie* case, the defendant must provide a legitimate, non-discriminatory reason for the adverse employment action. If the defendant can proffer such a reason, the plaintiff must show that it is a pretext for discrimination. *Shahin*, 424 F. App'x at 93 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973)).

### b. *Discussion*

Verizon argues that Plaintiff has not suffered any adverse employment action within the applicable statutes of limitations.

Claims under the NJLAD are subject to a two-year statute of limitations. *Rodriguez v. Raymours Furniture Co., Inc.*, 138 A. 3d 528, 536. (N.J. 2016). Certain claims under § 1981, including ones like Plaintiff's here, are subject to a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-383 (2004) (applying a four-year statute of limitations to § 1981 claims that arose under a 1991 amendment that expanded the universe of claims under the statute).

The original complaint in this action was filed on April 5, 2019. Under the four-year § 1981 statute, there must be therefore be an allegation of an

adverse employment action occurring after April 5, 2015; under the two-year NJLAD statute, the cutoff date is April 5, 2017.

The statute of limitations runs from the date that the last unlawful employment practice occurred. *See Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* In the case of "discrete acts" which are actionable in themselves, "only incidents that took place within the timely filing period are actionable." *Id.* I therefore look for an allegation of the last act that completes the violation—*i.e.,* an adverse employment action—within the limitations period. *See Red v. Potter*, 211 F. App'x 82, 85 (3d Cir. 2006) (treating the plaintiff's demotion and termination as "incidents of discrimination" that set the statute of limitations running in a Title VII retaliation case); *Chugh v. Western Inventory Services, Inc.*, 333 F. Supp. 2d 285, 295 (D.N.J. 2004) (for § 1981 claim, treating discriminatory/retaliatory discharge as relevant date triggering four-year statute of limitations); *see also Alexander v. Seton Hall Univ.*, 204 N.J. 219, 228 (2010) ("Discriminatory termination and other similar abrupt, singular adverse employment actions that are attributable to invidious discrimination, prohibited by the [NJ]LAD, generally are immediately known injuries, whose two-year statute of limitations period commences on the day they occur.").[4]

---

4    Here I set aside the § 1981 claim of a hostile work environment (*see* Count 6), which may consist of a series of events, not individually actionable, running into the limitations period. *See Verdin v. Weeks Marine Inc.*, 124 F App'x 92, 96 (3d Cir. 2005) (applying Title VII analysis to a Section 1981 claim and assessing the pattern of events as a whole for liability under a hostile work environment theory)

Consideration of the timeliness of Count 3, the Title VII hostile work environment claim, has been deferred pending analysis of the exhaustion of administrative remedies. *See* Section IV.1, *supra. See generally Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) ("Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim" under Title VII); *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (for Title VII hostile work environment claim, such acts "can occur at any time so long as they are linked in a pattern of

14

Under Title VII, and by extension under § 1981,[5] an actionable adverse employment action does not encompass mere "unpleasantness that may be encountered in the work place." *Walker v. Centocor Ortho Biotech, Inc.* 558 F. App'x 216, 219 (3d Cir. 2014). Rather, an adverse employment action must be one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment, deprive her future employment opportunities, or otherwise have a 'materially adverse' effect on her status as an employee." *Hargrove v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 427 (D.N.J. 2003) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300–01 (3d Cir. 1997) (citing *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749, 118 S. Ct. 2257 (1998) (defining adverse employment action as "significant change in employment status, such as hiring, firing, failing to promote, reassignment, a decision causing a significant change in benefits").

An adverse employment action thus may fall well short of dismissal, but it must affect employment status. Some representative examples of an adverse employment action follow. See *Nichols v. Caroline Cnty. Bd. of Educ.*, No. 02-3523, 2004 U.S. Dist. LEXIS 2851, 2004 WL 350337 (D. Md. Feb. 23, 2004), *aff'd*, 114 Fed. App'x 576 (4th Cir. 2004) (downgrade of teacher's certificate, which resulted in salary decrease and ultimate termination, was adverse employment action); *Coles v. Perry*, 271 F. Supp. 2d 157 (D.D.C. 2003)

actions which continues into the applicable limitations period") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S. Ct. 2061 (2002)).

5     An adverse employment action is defined similarly for purposes of Title VII and NJLAD. *Marrero v. Camden Cnty. Bd. of Soc. Servs.*, 164 F. Supp.2d 455, 473 (D.N.J. 2001) ("In order to constitute adverse employment action for purposes of the LAD, retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate, or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee.") (quoting *Hurley v. Atlantic City Police Department*, No. 96-4928, 1998 WL 351781, *at* *12 (D.N.J. May 28, 1998)); *see also Tourtellotte*, 636 F. App'x at 842 (The "discrimination inquiry is the same for claims filed under Tide VII and the NJLAD as the New Jersey statute borrows the federal standard . . . .").

       Section 1981, too, follows Title VII in defining an adverse employment action. *See Walker v. Centocor Ortho Biotech, Inc.* 558 F App'x 216, 218-219 (3d Cir. 2014) (analyzing "adverse employment action" under the Title VII framework).

(decision to remove employee from best qualified list for vacant promotional position, thus destroying employee's ability to advance from lower position, was adverse employment action); *Webb v. Secretary*, No. 85-6833, 1986 U.S. Dist. LEXIS 23229 (E.D. Pa. July 3, 1986) (lateral transfer and lower than expected performance evaluation was adverse employment action).

At least for present purposes, Verizon does not deny that an adverse employment action *ever* occurred; what it claims here is that no adverse employment action occurred within the limitations period(s).[6] Focusing on the longer, four-year statute, we find a convenient break in the events; almost exactly four years before filing the complaint in this action, Ms. Williams took a three-month break from her employment, from April through June 2015. Even if not precisely dated, events occurring before that hiatus would fall outside of the four-year limitations period.

Williams's complaint describes a number of harassing events that occurred before the April-June 2015 hiatus. The only alleged harassment dating from *after* Williams returned to work in June 2015 is the verbal abuse she received from "Missy" and "Debbie." (1AC ¶ 44). Whether or not this harassment was racially motivated, there is no allegation that it constituted an adverse employment action, or that Williams suffered any kind of adverse employment action as a result. Even though many of the comments were made during staff meetings, there is no indication that supervisors or management resultingly viewed Williams in a worse light, changed her job responsibilities, or took any action against her at all. Accordingly, she has not suffered any adverse employment action within the § 1981 four-year statute of limitations. *A fortiori*, no such action occurred within NJLAD's two-year statute of limitations.

Plaintiff appears to argue in the alternative that she has pled a continuing violation which extended into the limitations period. The continuing

---

[6]     As Verizon reads the allegations, the last event that could arguably be termed an adverse employment action occurred when, during her annual performance review, Rheubottom-Wilson accused her of attacking Britt, which occurred sometime prior to the 2014 holiday season. (1AC ¶ 24; *see* pp. 3–4, *supra.*)

violation theory is more appropriately considered in relation to the hostile work environment claims asserted in Counts 3 and 6. For such a claim, acts outside the limitations period can be used to support a claim if the hostile environment continues into the limitations period. The theory does not apply, however, to discrete, actionable acts of discrimination. *See Morgan,* 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.")

Accordingly, the motion to dismiss Counts 2 and 5 is granted, based on the lack of an allegation of a discrete, actionable adverse employment action within the limitations period.

### 3. § 1981 hostile work environment claim: Count 6

Count 6 of the Amended Complaint asserts a claim of hostile work environment under 42 U.S.C. § 1981.[7] To make out a hostile work environment claim on the basis of race under § 1981, "a plaintiff must show that 1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]." *Castleberry v. STI Group,* 863 F. 3d 259, 265 (3d Cir. 2017) (quotation omitted).

Citing the four-year statute of limitations for § 1981 claims, *see* Section IV.2, *supra,* Verizon argues that only conduct that occurred after April 2015 is actionable. As to a hostile work environment claim, however, the continuing violation doctrine is available. A hostile environment claim may encompass a series of actions that would not be actionable individually, but which, taken

---

[7]     This is not to be confused with the Title VII hostile work environment claim in Count 3. As noted above, I have deferred further consideration of Count 3 pending determination of the threshold issue of administrative exhaustion. While similar to Title VII claims, § 1981 claims are distinct and, notably, not subject to an administrative exhaustion requirement.

together, amount to a continuing pattern—in this case, a racially hostile environment. To be timely, such a claim must allege a continuing pattern of conduct that extends into the limitations period. If so, then the older conduct may be included in the hostile work environment claim. At a minimum, however, one unlawful (here, racially hostile) act must have occurred within the limitations period. *Mandel*, 706 F. 3d at 165-166; *Verdin*, 124 F. App'x at 96 (noting the applicability of Title VII's continuing violation theory to a § 1981 claim).

As noted above, only the actions of "Missy" and "Debbie" occurred within the four-year limitations period. The question is whether those acts are alleged to be part of an ongoing pattern of racial hostility. None of their allegedly harassing comments make any reference to Williams's race or otherwise appear to be motivated by racial animus. It is true that some comments were allegedly directed at Williams's foreign origin, or expressed disapproval of her (supposed) sending of money to relatives abroad. While the Third Circuit has not ruled directly on this issue, the case law consensus seems to be that § 1981 does not apply to claims based on national-origin discrimination. *See Wesley v. Palace Rehabilitation & Care Center, L.L.C.*, 3 F. Supp. 3d 221, 229 (D.N.J. 2014) (analyzing this issue and surveying decisions from other circuits as well as courts within the Third Circuit). At any rate, Ms. Williams's complaint does not even purport to assert a § 1981 national-origin claim; it claims racial discrimination. (*See* 1AC at 24-25). None of the harassing comments within the limitations period fit that racial description.[8]

The relevant conduct, then, is not unlawful under § 1981. Since no incident of *racially* hostile conduct occurred within the applicable limitations period, Plaintiff does not enjoy the benefit of the continuing violation doctrine

---

[8]     I note also that the situation with Missy and Debbie arose after Ms. Williams had been transferred out of the area where she had experienced the prior harassment, which would tend to break the chain of events alleged to form a pattern. There is no allegation that Missy and Debbie interacted or acted in concert with the persons who had allegedly expressed racial hostility.

in connection with her § 1981 hostile work environment claim. Accordingly, Count 6 is dismissed.

### 4. § 1981 retaliation claim: Count 7

Count 7 asserts a claim of retaliation under 42 U.S.C. § 1981. To make out a *prima facie* retaliation claim, the plaintiff must show that 1) she engaged in protected activity, 2) her employer took an adverse employment action against her, and 3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F. 3d 788, 798 (3d Cir. 2010) (citing *Moore v. City of Philadelphia*, 461 F. 3d 331, 340-41 (3d Cir. 2006)).

Again, the four-year statute of limitations for § 1981 claims dictates that only the allegations relating to "Missy" and "Debbie" are pertinent. The complaint alleges that Missy yelled at Williams and called her names during a staff meeting. This occurred after Williams complained to supervisors about her co-workers' conduct. I will assume that Williams could meet the first element— *i..e.,* that her complaint to supervisors constituted protected activity. Still, there is no indication that Missy's shouting rose to the level of an adverse employment action, or that Williams suffered any other adverse employment action thereafter. Williams's contention that her coworker Missy's comments tended to "isolate" Williams is not sufficient to transform them into an adverse employment action. (1AC ¶ 44). And the alleged indifference of management, though hardly commendable, does not in itself rise to the level of a retaliatory adverse employment action.

This failure to allege the second prong renders Williams unable to make a *prima facie* case for retaliation under § 1981. Accordingly, Count 7 is dismissed.

### 5. § 1985(3) Conspiracy Claim: Count 8

In Count 8, Williams asserts a violation of 42 U.S.C. § 1985, a statute providing civil remedies for a conspiracy to interfere with civil rights. She presumably means to invoke subsection (3), which focuses on equal

protection.[9] Section 1985(3) does not create substantive rights, but "serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere." *Brown v. Philip Morris Inc.*, 250 F. 3d 789, 805 (3d Cir. 2001) (citing *Great American Federal Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)).

Title VII violations must be redressed within the remedial scheme of Title VII. Thus the substantive rights provided by Title VII are not independently actionable under § 1985(3). *Novotny*, 442 U.S. at 378 ("[W]e conclude that § 1985(3) may not be invoked to redress violations of Title VII."). Williams's Title VII allegations, then, provide no foundation for her § 1985(3) claim.

In the alternative, Plaintiff points to her § 1981 allegations as the substantive basis for the § 1985(3) claim. (Pl. Opp. at 19). Verizon counters that violations of 42 U.S.C. § 1981, like violations of Title VII, are not actionable under § 1985(3). The case Verizon cites, *Brown v. Philip Morris Inc.*, 250 F. 3d 789 (3d Cir. 2001), does not go quite that far. In dictum, however, *Brown* does express great reluctance to allow § 1985(3) liability for violations of § 1981. *Id.* at 806. ("The great weight of precedential authority, however, supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action."). *Brown* did not need to conclusively "resolve the question" because it determined that the plaintiff had in any case failed to state a claim under § 1981. *Id.* Even so, other cases in this district have interpreted *Brown* to limit § 1985 liability for private actors to violations of the right to interstate travel and freedom from involuntary servitude. *Shine v. TD Bank Financial Group*, No. 09-4377, 2010 WL 2771773, at *9 (D.N.J. July 12, 2010); *Andrews v. Hanover Marriot*, No. 06-1039, 2008 WL 11383866, at *8 (D.N.J. June 25, 2008). I follow their lead.

---

[9]     The factual allegations suggest no obvious connection to subsection (1) (preventing officers of the United States from performing official duties) or subsection (2) (obstruction of justice and intimidating witnesses or jurors). 42 U.S.C. § 1985.

Plaintiff has not claimed that her right to interstate travel has been infringed or that she has been subjected to involuntary servitude. I hold that her claims under § 1981 do not give rise to liability for a private actor under § 1985(3). Accordingly, Count 8 is dismissed for failure to state a claim.

### 6. Common Law Claims

Williams's amended complaint, in scattershot fashion, alleges various claims under state common law. *See* Counts 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22. Some fail to state a cognizable claim. Many are not causes of action at all, but instead assert untethered contentions or theories of vicarious liability, such as *respondeat superior*. Verizon has moved to dismiss each one, providing legal support for each of its arguments. (DE 17-1).

Williams's papers respond to Verizon's arguments as to Count 17 (*respondeat superior*). I discuss Count 17 in subsection 6(a), *infra*.

As to the rest—Counts 10–16 and 18–22—Williams makes scarcely any argument, or no argument at all. A plaintiff concedes a claim when she fails to oppose arguments in support of a motion to dismiss it under Fed. R. Civ. P. 12(b)(6). *O'Neal v. Middletown Twp.*, No. 18-5269, 2019 U.S. Dist. LEXIS 59, at *9, 2019 WL 77066 (D.N.J. Jan. 2, 2019); *see also Hollister v. U.S. Postal Serv.*, 142 F. App'x 576, 577 (3d Cir. 2005); *Person v. Teamsters Local Union 863*, No. 12-2293, 2013 U.S. Dist. LEXIS 149252, at *2, 2013 WL 5676802 (D.N.J. Oct. 17, 2013); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003), aff'd, 136 F. App'x 551 (3d Cir. 2005). For that reason alone, those enumerated counts might be dismissed. I nevertheless discuss them briefly and confirm that they should be dismissed for failure to state a claim. *See* subsections 6(b), (c), (d), (e) and (f).

#### a) Respondeat superior: Count 17

Count 17 of Williams's amended complaint purports to state a cause of action for *respondeat superior*. *Respondeat superior* is not properly understood as a cause of action in its own right. *See Rowan v. City of Bayonne*, 474 Fed. App'x 875, 878 n.3 (3d Cir. 2012) (citing *Carter v. Reynolds*, 175 N.J. 402, 815

A.2d 460 (2003)). Rather it is a legal doctrine under which a court may impose vicarious liability on the employer of a person who has committed some independent tort. *Carter*, 175 N.J. at 408, 815 A.2d 460 (citing W. Page Keeton, Prosser and Keeton on the Law of Torts §§ 4, 69 at 21–23, 449–501 (5th ed. 1984)). *Respondeat superior* is not in itself, then, a "claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). Count 17 is therefore dismissed.

That is not to say, however, that the doctrine of *respondeat superior* may not apply in the context of the plaintiff's tort claims. I therefore discuss it briefly for future guidance.

An employer may be liable for an employee's tortious acts when such acts are committed within the scope of employment. *Carter*, 175 N.J. at 408–09, 815 A.2d 460. In order to establish liability under the doctrine of *respondeat superior*, a plaintiff must establish: (1) that the wrongdoer is employed by the defendant; (2) acts or omissions causing injuries or damages to others; and (3) that the employee committed the acts or omissions within the scope of his or her employment, *i.e.*, when the employee was performing the services for which he or she had been engaged. *Davis v. Devereux Found.*, 209 N.J. 269, 287, 37 A.3d 469 (2012); *see also* 23 Restatement (Second) of Agency § 219 (1958). The term "scope of employment" refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though improper ones, of carrying out the objectives of employment. *Carter*, 175 N.J. at 411, 815 A.2d 460 (quotations omitted).

The scope-of-employment issue comprises a two-part inquiry. *Stroka v. United Airlines*, 364 N.J. Super. 333, 339, 835 A.2d 1247 (App. Div. 2003). First, there must be a time-and-place nexus between the employment and the incident. *See Coleman v. Cycle Transformer Corp.*, 105 N.J. 285, 288–89, 520 A.2d 1341, (1986). Second, there must be a causal connection between the employment and the incident itself. *Id.* To demonstrate the causal connection between the employment and the incident, "[i]t must be established that the

work was at least a contributing cause of the injury and that the risk of the occurrence was reasonably incident to the employment." *Id.* at 290, 520 A.2d 1341. "[T]he 'but for' or positional-risk test" used for this analysis in New Jersey asks "whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere." *Id.* at 290–91, 520 A.2d 1341 (quoting *Howard v. Harwood's Rest Co.*, 25 N.J. 72, 83, 135 A.2d 161 (1957)). "[R]isks that result from a purely personal activity" are deemed to fall outside of the course of employment. *Id.*

Here, Verizon concedes (or at least does not contest) that it employed the persons whom Williams accuses of harassing or injuring her in the workplace. The *respondeat superior* inquiry will thus probably depend on whether the allegedly tortious conduct occurred within the scope of any such individual's employment. Should the employee's commissions of a tort be established, then Verizon's liability via *respondeat superior* may become an issue. As a standalone cause of action, however, it is superfluous; Count 17 is therefore dismissed.

b) *Other theories of liability not amounting to causes of action: Counts 16, 18, and 22*

My resolution of Counts 16, 18, and 22 is similar.

Vicarious liability (Count 16) is a legal theory by which a third-party can be held liable for a tortfeasor's conduct. It is not an independent cause of action. *Galicki v. New Jersey*, No. 14-169, 2016 U.S. Dist. LEXIS 126076, at *108–09, 2016 WL 4950995 (D.N.J. Sep. 15, 2016).

Ratification (Count 18) is "the affirmance by a person of a prior act which did not bind him but which was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *In re Dwek*, Nos. 07-1616, 07-1697, 2010 Bankr. LEXIS 1859, 2010 WL 2196417 (Bankr. D.N.J. June 1, 2010) (quoting *Martin Glennon, Inc. v. First Fid. Bank, N.A.*, 279 N.J. Super. 48, 60, 652 A.2d 199 (App. Div. 1995)). It, too, is a theory by which a third party may be held liable for the act of a tortfeasor; it is not in itself a cause of action. *Id.*

Punitive damages (Count 22) are a remedy, not a cause of action. *See Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000).

To be clear, these theories are not hereby banished from the case; the point, as in the case of respondeat superior, is that they do not constitute causes of action in their own right. Because Plaintiff has offered no substantial arguments in response to the motion to dismiss these counts, and because in any event they fail to state a claim upon which relief can be granted, Counts 16, 18, and 22 are dismissed.

### c) Invasion of Privacy: Count 10

In Count 10, Williams alleges an invasion of privacy, in the sense of an intrusion "upon the solitude or seclusion of her private affairs or concerns." (1AC at 33 ¶ 2). As she explains, the defendants "violated [her] reasonable expectation of privacy by entering into [her] office while she was not there and hanging offensive and racist office decorations. Defendants further violated [her] reasonable expectation of privacy by permitting its employees to engage in harassing and racist discussions about [her] personal life." (1AC at 33 ¶ 4).

The common-law right to privacy encompasses multiple torts, including intrusion upon seclusion, public disclosure of private facts, placing plaintiff in a false light in the public eye, and appropriation of plaintiff's name or likeness. *Rumbauskas v. Cantor*, 649 A. 2 853, 856 (N.J. 1994) (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 117 (5th ed. 1984)). Plaintiff does not specify which tort she is claiming, but only two seem potentially relevant to the allegations: false light defamation and intrusion on seclusion.

The statute of limitations is two years for intrusion upon seclusion and one year for placing plaintiff in a false light. *Smith v. Dalta*, 164 A. 3d 1110, 1117 (N.J. Super. Ct. App. Div. 2017). At the outset, then, it appears that the statute of limitations rules out the bulk of the factual allegations in the

complaint.[10] I state this for the parties' guidance in the event the complaint is amended.

The first potentially applicable privacy tort is that of false light. *See Romaine v. Kallinger*, 537 A. 2d 284, 289 (N.J. 1988) ("It is accepted in New Jersey that a cause of action exists for invasions of privacy involving publicity that unreasonably places the other in a false light before the public."). This tort typically involves some sort of publication or dissemination. *See, e.g.*, Romaine, 537 A. 2d (book), DeAngelis *v. Hill*, 847 A. 2d 1261 (N.J. 2004) (newsletter), *G.D. v. Kenny*, 15 A. 3d 300 (N.J. 2011) (political flyer). To state a claim for this tort, a defendant must "give publicity to a matter concerning another that places the other before the public in a false light [and] (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Romaine*, 537 A. 2d at 290.

Williams has not, in her complaint or her briefing, identified the factual allegations that would support liability under this tort. The only examples of statements to others, let alone the "public"—particularly within the limitations period—would have to be insulting comments made by co-workers. Thus, for example, Missy allegedly called Williams "evil" and "a bitch." These insults, however, amount to little more than name-calling; they contain nothing specific, factual, or private about Williams, the public disclosure of which could give rise to a claim for the tort of false light.

Next is the tort of intrusion upon seclusion. *See Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 94, 609 A.2d 11 (1992). That tort imposes liability on "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the

---

10    Other privacy torts have their own limitations periods. *See Smith*, 164 A.3d at 1117, 1123.

intrusion would be highly offensive to a reasonable person." *Id.* at 94–95, 609 A.2d 11 (quoting Restatement (Second) of Torts § 652B (1977)).

Under New Jersey law, an essential element of the intrusion tort is that the plaintiff possess a reasonable expectation of privacy:

> [T]he intrusion must be "highly offensive to a reasonable person," a determination that turns on what a person's reasonable expectation of privacy is with respect to the item or area searched or intruded upon. Thus, an intrusion is not highly offensive "when the [defendant] intrudes into an area in which the victim has either a limited or no expectation of privacy." Notwithstanding a plaintiff's subjective expectations of privacy, a court must determine whether objectively, given the facts and circumstances of the particular case, a person would reasonably believe he has an expectation of privacy.

*Poltrock v. N.J. Auto. Accounts Mgmt. Co.*, No. 08-1999, 2008 WL 5416396 (D.N.J. Dec. 22, 2008) (Wolfson, J.) (quoting *White v. White*, 344 N.J. Super. 211, 222, 781 A.2d 85 (2001)) (citing *State v. Hempele*, 120 N.J. 182, 200, 576 A.2d 793 (1990) (holding that "expectations of privacy are established by general social norms")), quoted in *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 315 (D.N.J. 2013) (dismissing privacy claim based on an intrusion into employee's locker).

Williams has not alleged facts to establish that she had a reasonable expectation of privacy in her workspace. In a prior case, I reviewed the law thus:

> [W]hether an employee has a reasonable expectation of privacy in her particular work setting "must be addressed on a case-by-case basis."
>
> In *Ratti v. Serv. Mgmt. Sys., Inc.*, the plaintiff-employee claimed intrusion after his employer opened his locked desk drawer and discovered a pellet gun inside. In granting summary judgment in favor of the employer, the court found that the employee had no objectively reasonable privacy right because "[t]he desk was located at his place of employment in an unlocked office, used by other employees, and contained his employer's documents."

*Torsiello*, 955 F. Supp. 2d at 315 (quoting *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300, 317, 990 A.2d 650 (2010)) (citing *Ratti v. Serv. Mgmt. Sys.*, Inc., No. 06-6034, 2008 WL 4004256, at *3 (D.N.J. Aug. 25, 2008)). I held that the locker in the *Torsiello* case, like the desk drawer in *Ratti*, was at a place of employment and was alleged to contain files to which the business would have needed access. I therefore dismissed the claim without prejudice for failure to adequately allege an expectation of privacy.

An expectation of privacy, if properly alleged, may indeed pose an issue requiring further factual development. As noted above, however, an intrusion is not actionable when the complaint demonstrates that the area is one "in which the victim has either a limited or no expectation of privacy." *White*, 344 N.J. Super. at 222, 781 A.2d 85. Here, the complaint merely alleges in conclusory fashion that the plaintiff had "a reasonable expectation of privacy inside of her office at Verizon." (1AC at 33 ¶ 3). A person is not *presumed* to have a privacy interest in the employment environment, however, and the complaint fails to allege any facts suggesting such an expectation.

Indeed, the allegations suggest the opposite. Two photographs, including one of the allegedly racist holiday decorations, are attached as Exhibits A & B to the original complaint. (DE 1 at pp. 53–56)[11] Ex. B appears to depict an open, common area, which makes sense given that these were office decorations. The complaint also alleges that two co-workers placed a depiction of a rat on Williams's desk, or situated a witch doll facing Williams's "workspace." (1AC ¶¶ 37, 33). This, too is not a location alleged to be private, since it is explicitly alleged that the co-workers were able to harass Williams because they were all in adjoining "workstations." (1AC ¶ 27). Williams calls her work station an "office," but she does not allege that her workstation was secluded, or that access to the area was restricted. (Ex. A appears to depict the work stations.) In short, these seem to be common workspace cubicles, not

---

[11]    The amended complaint continues to cite to Exhibits A and B, but they are no longer attached. I assume this was an oversight.

private or locked offices. More facts would be required before the court could find that a legitimate expectation of "privacy" had been alleged.[12]

However offensive, these actions are not adequately alleged as invasions of privacy. Because Count 10 fails to allege facts suggesting either the public disclosure of false information or a reasonable expectation of privacy that could give rise to an "intrusion upon seclusion," it is dismissed.

### d) *Intentional Infliction of Emotional Distress: Count 11*

A claim of intentional infliction of emotional distress ("IIED") requires the plaintiff to allege four essential elements:

1. that defendant acted intentionally or recklessly, both in committing the alleged tortious acts and in producing emotional distress;

2. that defendant's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency;

3. that defendant's actions were the proximate cause of the emotional distress; and

4. that the emotional distress suffered was so severe that no reasonable person could be expected to endure it.

*Mardini v. Viking Freight, Inc.*, 92 F. Supp. 2d 378,384 (D.N.J. 1999) (citing *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857 (1988)); see also *Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 235 (D.N.J. 2000). It is "extremely rare" to find actionable IIED in the employment context. *See Griffin v. Tops Appliance City, Inc.*, 766 A. 2d 292, 297 (N.J. Super. Ct. App. Div. 2001) (quoting *Cox v. Keystone Carbon Co.*, 861 F. 2d 390, 395 (3d Cir. 1988)). *See also* N.J. Stat. Ann. § 2A:14-2 (general two-year statute of limitations, subject to doctrines of accrual and tolling).

Williams has not clearly alleged a timely claim that Verizon committed acts so "outrageous" as to rise to the level of the "extremely rare" case of

---

12    Moreover, while it is not expressly stated, it appears that these decorations were put up during the 2014 holiday season, well outside the two-year statute of limitations. The description of the decorations comes sequentially before Plaintiff's taking disability leave in April 2015. (1AC ¶¶ 38-41).

workplace IIED.[13] At any rate, Williams's briefing makes no response to the motion to dismiss the IIED claim, and I will not construct an argument for her. Accordingly, Count 11 is dismissed as to Verizon.

*e) Negligence Claims: Counts 12, 13, 14, 15, 19, and 20*

The amended complaint asserts six claims sounding in negligence: Negligent Infliction of Emotional Distress ("NIED") (Count 12); Negligent Hiring (Count 13); Negligent Supervision (Count 14); Negligent Retention (Count 15); Failure to Warn/Misrepresentation (Count 19); and Gross Negligence (Count 20).

An employee may not "sue his [or her] employer in negligence nor can the employee sue a co-employee." Such on-the-job negligence claims are subsumed by the scheme set up by the Workers Compensation Act, N.J. Stat. Ann. § 34:15-8; *see also Wellenheider v. Rader*, 49 N.J. 1, 9, 227 A.2d 329 (1967); *Millison v. E.I. du Pont de Nemours & Co.*, 101 N.J. 161, 165, 501 A.2d 505 (1985). That is so regardless of the kind of injury alleged. See *Rodriguez v. Ready Pac Produce*, No. 13-4634, 776 F.3d 276, 2014 U.S. Dist. LEXIS 64139, at *17 (D.N.J. 2014). The proper forums for such grievances are the administrative bodies designed by the New Jersey Legislature for the purpose.

Plaintiff has offered no substantive argument in response to the motion to dismiss the negligence counts as being preempted by Workers Compensation. Counts 12, 13, 14, 15, 19,[14] and 20 are dismissed.

*f) Civil Conspiracy: Count 21*

A cause of action for civil conspiracy requires a plaintiff to allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury

---

13    At best, the claim against Verizon itself seems to be that Verizon "permitted" its employees to harass her. (1AC at 35 ¶ 4)

14    With respect to Count 19 only, Plaintiff did make several substantive arguments. She did not, however, address the issue of preemption by the Workers' Compensation scheme. (Pl. Opp. at 29-30).

upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 876 A.2d 253 (2005). "A corporation and its employees are not separate persons for the purpose of civil conspiracy, and a conspiracy cannot exist in the absence of two or more persons acting in concert." *Marjac, LLC v. Trenk*, 2006 U.S. Dist. LEXIS 91574, at *51, 2006 WL 3751395 (D.N.J. Dec. 19, 2006); *Nat'l Auto Div., LLC v. Collector's All., Inc.*, No. A-3178, 2017 N.J. Super. Unpub. LEXIS 234, at *13, 2017 WL 410241 (App. Div. Jan. 31, 2017). "The gravamen of a conspiracy action is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015).

Here, the agreement to commit some underlying tort is not alleged with any specificity, and at least one potential theory—the corporation's conspiring with its employees—is ruled out as a matter of law. *See Marjac, supra.* Count 21 is therefore dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Verizon's motion to dismiss is **GRANTED** as to Counts 2, 5-8, and 10-22. The motion to dismiss is **DENIED** as to Counts 1, 3, 4, and 9.

Verizon is authorized to file a focused motion for summary judgment, confined to the issue of exhaustion of administrative remedies as to Counts 1, 3, 4, and 9. To the extent Counts 1, 3, 4, and 9 may survive the exhaustion analysis, Verizon's motion may, in the alternative, reassert the other grounds for dismissal of those counts that it asserts here. Verizon may do so by incorporation of its arguments on this motion to dismiss; plaintiff may likewise incorporate by reference her arguments in opposition to this motion to dismiss. If Defendant chooses to file such a summary judgment motion, Plaintiff shall have 30 days to respond.

Dated: March 12, 2020

HON. KEVIN MCNULTY, U.S.D.J.