UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MYRNA WILLIAMS**<br><br>Plaintiff,<br><br>v.<br><br>**VERIZON NEW JERSEY, INC., et al,**<br><br>Defendants. | Civ. No. 2:19-09350 (KM-SCM)<br><br>**OPINION** |

**MCNULTY, U.S.D.J.:**

Plaintiff Myrna Williams is an employee of Defendant Verizon New Jersey ("Verizon"). (1AC ¶ 4 (DE 1)).[1] She has raised a variety of statutory and common law claims against her employer relating to alleged discrimination on the basis of her race, which is African American. In moving to dismiss the complaint, Verizon raised the possibility that Williams failed to exhaust her administrative remedies for a number of her claims. This motion is for summary judgment as to that issue.

For the reasons set forth in more detail below, Verizon's motion is granted.

---

[1] Citations to certain record items will be abbreviated as follows:

DE = Docket entry number

1AC = First Amended Complaint (DE 14)

Def. Brf. = Verizon's Brief in Support of its Motion for Summary Judgment (DE 36-1)

DSMOF = Verizon's Statement of Material Facts as to which No Genuine Issues Exist (DE 36-2)

1

## I.   FACTUAL BACKGROUND

In evaluating whether Williams exhausted her administrative remedies, I must determine whether claims in an administrative filing are fairly related to claims in her complaint. The following is a combination of allegations from her first amended complaint, the truth of which has not been proved, and facts presented by Verizon alongside its motion for summary judgment.

### A. Allegations of Discrimination

Plaintiff Myrna Williams is a woman of African descent, originally from St. Lucia. (1AC ¶ 1). She has been a full-time employee of Defendant Verizon since 1989, holding a variety of job titles and responsibilities. (*Id.* ¶ 4). Williams's career at Verizon was productive and fulfilling until 2007. (*Id.* ¶ 6). At that point, however, Williams began to experience ongoing and pervasive harassment. (*Id.* ¶ 8).

The first incident occurred in 2008, eleven years before the filing of the complaint. At that time, Williams was allegedly denied a personal day off for Martin Luther King Day by her new supervisor, LaVerne Francis. (*Id.* ¶¶ 7,10). She brought the issue up to her manager, Salvatore Lobue. (*Id.* ¶ 11). Lobue, however, did not assist her, and in fact would often overlook complaints from workers in Verizon's predominantly African American Newark office, while promptly assisting workers in Verizon's predominantly Caucasian Mt. Laurel office. (*Id.*). Williams sought intervention from her union. (*Id.* ¶ 12). Afterwards, Ms. Francis retaliated against Williams by acting in a spiteful and petty manner, for example by requesting she resubmit previously completed assignments. (*Id.* ¶ 12).

In an effort to obtain mediation of the dispute, Williams began copying her manager, Lobue, on correspondence between herself and Ms. Francis. (*Id.* ¶ 13). Rather than taking action to solve the problem, Lobue compounded the harassment by passing over Williams's department for overtime work. (*Id.*). Plaintiff ultimately sought and received redress through union arbitration. (*Id.* ¶ 14). Nonetheless, the problem of harassment continued. (*Id.* ¶ 15).

In 2009, Plaintiff was transferred to Verizon's East Brunswick office along with three other African American employees. (*Id.* ¶¶ 16-17). Williams and other African American employees were treated differently from the Caucasian employees in East Brunswick. (*Id.* ¶ 17). One example of such disparate treatment was that Plaintiff was denied a personal day to attend the funeral of her deceased aunt, while Caucasian employees were granted leave under similar circumstances. (*Id.* ¶ 18). Another is that an African American co-worker was punished for often arriving to work late in East Brunswick because she did not own a vehicle. Later, when the whole office was transferred to Newark, Caucasian workers traveling to Newark were granted accommodations for their disrupted travel. (*Id.* ¶ 19).

At the East Brunswick office, Williams also had a tense relationship with her new supervisor, Cherisse Rheubottom-Wilson. (*Id.* ¶ 20). This supervisor, along with a subordinate, Judith Britt, teamed up to harass Williams. (*Id.* ¶ 23). Harassment included threatening Plaintiff with suspension for stepping away from her desk to deal with a medical condition; barging into the restroom to demand she immediately join a meeting; yelling at Plaintiff from across the office in order to humiliate her; and using Plaintiff's annual review as an excuse to antagonize her and accuse her of attacking Britt. (*Id.* ¶¶ 23-24).

Williams's attempts to seek help from Verizon's human resources department were ignored. (*Id.* ¶ 24). Indeed, her reports earned her a reputation as a troublemaker, and she continued to be denied overtime opportunities and time off. (*Id.* ¶ 25).

Rheubottom-Wilson and Britt left the company at some unspecified time. Williams's circumstances did not improve, however, since two new coworkers arrived and continued to harass her. Defendants Tina Kalfin and Tara Finnegan were placed in workstations next to that of Williams. (*Id.* ¶ 27). These individuals were generally antagonistic to everyone in the office—for example, they referred to the new manager as "That Bitch." Their insults, however, often took a racial form. (*Id.* ¶ 28). The two would openly comment on racially

charged current affairs; they made light of police shootings involving African Americans; they expressed satisfaction that Bill Cosby, an African American, had been arrested; and they wore "hoodie" sweatshirts to work shortly after a fatal shooting of an African American boy who had been wearing a hoodie at the time. (*Id.* ¶¶ 29, 30).

On one occasion, after Williams asked Kalfin to lower the volume on her radio, Kalfin and Finnegan refused to speak to her. (*Id.* ¶ 31). Another time, Finnegan hovered behind Williams while she was working, and when Williams noticed what she was doing, Finnegan started an argument which ended with her screaming at Williams and calling her a "witch." (*Id.* ¶ 32). Following this incident, the two continued harassing Williams with witch-themed insults; they placed a witch doll on their work desk facing Williams, and Finnegan came to work in a t-shirt labeled "You Witch." (*Id.* ¶ 33). While this antagonism was not explicitly racial in content, Plaintiff alleges that it came about because Kalfin and Finnegan disliked Williams for racial reasons. (*Id.*).

Williams's pleas to Verizon's human resources to remedy this harassment went unanswered. (*Id.* ¶ 35). After overhearing Kalfin and Finnegan planning to get her fired, Williams attempted to complain to the "Verizon Vice President." (*Id.* ¶ 36). Upon her return from a sick day, Williams found on her a desk a picture of a rat with its hands up. (*Id.* ¶ 37). Kalfin and Finnegan began referring to Williams as a "rat" and reminded her to "keep your hands up," which she took as a reference to the contemporaneous police shooting of Michael Brown, an African American. (*Id.* ¶ 37). Then, during the holidays, Kalfin and Finnegan placed a partially inflated reindeer with a wreath around its neck among the Christmas decorations. (*Id.* ¶ 38). The reindeer was kept partially deflated, which made it appear as if it were choking on the wreath, similar to hanging by a noose. (*Id.*). Additionally, the pair used tape to create an outline of a dead rat on the ground, evoking a chalk outline at a murder scene. (*Id.* ¶ 38).

Eventually, the Verizon Human Resources department responded to Williams regarding these "decorations," reporting that it had discovered no evidence of any violations of Verizon's code of business conduct. (*Id.* ¶ 39). That determination upset Williams to the point that she was unable to sleep that night and suffered from migraine headaches the next day, resulting in the paramedics arriving and taking her to the hospital. (*Id.* ¶ 40). The workplace stress and harassment led to additional health issues which required her to take off from work from April to June 2015. (*Id.* ¶ 41).

Upon returning to work in June 2015, Williams was moved to a different workspace and given a new assignment. (*Id.* ¶ 42). A Verizon "Department President" came to the office during this time and, during a meeting, commended Williams for dealing with such difficult co-workers. (*Id.*). The Department President stated during this meeting that Verizon's "employee screening" around 1998 was "insufficient due to conducting a mass hire." (*Id.*). (The co-workers hostile to Williams had been hired around that time.) (*Id.*).

In October of 2016, Williams was transferred to the Livingston call center. (*Id.* ¶ 43). In December of 2016, she was rewarded for excellent work by being transferred to a dispatch center. (*Id.* ¶ 43). Here, Williams endured harassment by two co-workers named "Missy" and "Debbie." (*Id.* ¶ 44). They constantly informed Williams of their dislike of "foreigners taking Americans' jobs and accused her of 'sending money back to your home country.'" (*Id.*). Williams's attempts to bring up these issues to a supervisor were ignored. (*Id.*). Williams also attempted to raise concerns during staff meetings, but was criticized by Missy as being the only one complaining. (*Id.*). Williams again tried to stand up for herself during a staff meeting, causing Missy to shout at her and call her "evil" and "a bitch." (*Id.* ¶ 45). Management, although present, made no effort to intervene. (*Id.*).

Williams claims that the harassment is ongoing and that Verizon has pursued a policy or pattern and practice of hiring unfit managers who allowed employees to openly harass her. (*Id.* ¶¶ 46-47). She asserts a variety of causes

of action, ranging from federal and state statutory violations to common law claims, against Verizon. The claims are also directed against several of the harassing employees in their individual capacities.

### B. Administrative Action

On June 26, 2019, Williams filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"). (DSOMF ¶ 4). She alleged that the discrimination was based on race and national origin. (DE 36-4). The Charge form has a space to fill in the earliest and latest dates the discrimination took place, and whether it is a continuing action. (*Id.*). Williams checked the box indicating that it is a continuing action, and filled in October 1, 2018 for both the earliest and the latest dates. (*Id.*). In describing the particulars of the claim, she wrote as follows:

> I began my employment with Respondent in 1986, my job title is Repair Service Clerk. On or about September 2018, Supervisor, Bill Baske was discussing a retirement a package that was released by the Respondent. Mr. Baske says I cannot retire yet I have a small child and they don't give us middle class people anything. Ms. Melissa Finklin replies, yes, only foreigners get everything, illegals.
>
> I believe I am the victim of unlawful employment discrimination on the basis of my national origin (West Indian), and my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended and all applicable state statutes.

(*Id.*). On or about July 16, 2019, the EEOC issued a "Dismissal and Notice of Rights" (the "Right-to-Sue Letter") to Williams. (DSMOF ¶ 14). The Right-to-Sue Letter indicated that the EEOC was declining to further investigate the Charge, and that Plaintiff had a right to file a lawsuit based on the Charge within 90 days. (DE 36-5). The Charge is the only Charge or administrative complaint of any kind that Williams has filed in support of these claims. (DSOMF ¶ 18).

## II.   PROCEDURAL HISTORY

Plaintiff filed her complaint in this action on April 5, 2019. (DE 1). Verizon first filed a motion to dismiss on June 20, 2019. (DE 11). On June 28,

6

2019, Plaintiff filed the first amended complaint, which asserts the following twenty-two causes of action:

1. Race-Based Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)

2. Race-Based Discrimination in Violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12

3. Race-Based Discrimination (Hostile Work Environment) in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)

4. Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)

5. Race-Based Discrimination (Disparate Treatment) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

6. Race-Based Discrimination (Hostile Work Environment) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

7. Race-Based Discrimination (Retaliation) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

8. Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985

9. Violation of the Americans with Disabilities Act

10. Invasion of Privacy

11. Intentional Infliction of Emotional Distress

12. Negligent Infliction of Emotional Distress

13. Negligent Hiring

14. Negligent Supervision

15. Negligent Retention

16. Vicarious Liability

17. Respondeat Superior

18. Ratification

19. Failure to Warn/Misrepresentation

20. Gross Negligence

21. Civil Conspiracy of Verizon Employees, its Members and Associated, and Verizon

22. Punitive Damages

(1AC).

Verizon filed a motion to dismiss on July 26, 2019. (DE 17). On March 12, 2020, I issued an Opinion granting the motion to dismiss as to Counts 2, 5-8, and 10-22. (DE 33). In the Opinion, I denied the motion to dismiss Counts 1, 3, 4, and 9 on the basis of failure to exhaust administrative remedies, but permitted Verizon to file a summary judgment motion as to that issue. (*Id.*). Verizon accordingly filed a summary judgment motion on April 6, 2020. (DE 36). Plaintiff filed a brief in opposition (DE 39), to which Verizon replied (DE 41).[2] For the reasons that follow, the motion for summary judgment will be granted.

### III. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to

---

[2] Plaintiff did not file a brief in opposition to summary judgment. Instead, she filed a photocopy of the brief she had previously filed in opposition to Verizon's motion to dismiss. (DE 39). In the Opinion granting in part and denying in part Verizon's motion to dismiss, I stated the following regarding incorporation of prior arguments:

> I will, however, authorize Verizon to file a focused motion for summary judgment, confined to the issue of exhaustion of administrative remedies as to Counts 1, 3, 4, and 9. The facts necessary for a response should be within plaintiff's control. To the extent Counts 1, 3, 4, and 9 may survive the exhaustion analysis, Verizon's motion may, in the alternative, reassert the other grounds for dismissal of those counts that it asserts here. Verizon may do so by incorporation of its arguments on this motion to dismiss; plaintiff may likewise incorporate by reference her arguments in opposition to this motion to dismiss.

(DE 33 at 12).

Plaintiff's counsel appears to have interpreted this to mean that the previously filed opposition brief will suffice for purposes of summary judgment here. Since Plaintiff has not disputed any of the facts Verizon offers, I deem them admitted.

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met the threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; see also Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine issues of material fact exist). In deciding a motion for summary judgment, the court's role is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies: Counts 1, 3, 4, and 9

Verizon asserts that summary judgment ought to be granted as to Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e3(a) ("Title VII") and the Americans with Disabilities Act ("ADA") because Plaintiff has not exhausted her administrative remedies.

### 1. Failure to obtain right-to-sue letter before filing civil action

Prior to commencing a Title VII action in court, the employee must first file a charge with the EEOC. *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019). Once the EEOC has received the charge, it notifies the employer and investigates the allegations, first pursuing informal methods of resolution and then being given the option of bringing suit against the employer itself. *Id.* at 1846-1847.

> In the event that the EEOC determines there is "n[o] reasonable cause to believe that the charge is true," the Commission is to dismiss the charge and notify the complainant of his or her right to sue in court. 42 U.S.C. § 2000e–5(b), f(1); 29 CFR § 1601.28. Whether or not the EEOC acts on the charge, a complainant is entitled to a "right-to-sue" notice 180 days after the charge is filed. § 2000e–5(f)(1); 29 CFR § 1601.28. And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer. § 2000e–5(f)(1).

*Id.* at 1847.

These procedures are mandatory and must be followed before bringing a private suit. *See id.* at 1851-1852 (noting that the claim-processing requirement was mandatory, though potentially subject to forfeiture as a defense if not timely raised). After filing the charge, and before filing suit, the complainant "must allow a minimum of 180 days for the EEOC investigation to proceed." *Burgh v. Borough Council of Borough of Montrose*, 251 F. 3d 465, 470 (3d Cir. 2001). If the EEOC decides not to pursue the matter further, it will notify the complainant, typically by means of a right-to-sue letter. "The receipt of the right-to-sue letter indicates that a complainant has exhausted administrative remedies, an essential element for bringing a claim in court

under Title VII." *Id.* "A complainant may not bring a Title VII suit without having first received a right to sue letter." *Id.*

The same process is required for ADA claims. *See Williams v. East Orange Community Charter School*, 396 F. App'x 895, 897 (3d Cir. 2010) (citing 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a)).

Ordinarily, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last discriminatory act. 42 U.S.C. § 2000e-5(e)(1). If, however, the plaintiff first institutes proceedings with a "State or local agency with authority to grant or seek relief from such practice," that 180-day limitations period is extended to 300 days. *Id.*

Any lawsuit resulting from the filing of an EEOC charge is limited to claims that are within the scope of that initial administrative charge. *Barzanty v. Verizon PA, Inc.*, 361 F App'x 411, 413-414 (3d Cir. 2010) (citing *Antol v. Perry*, 82 F. 3d 1291, 1296 (3d Cir. 1996)). Claims not reasonably within the scope of the administrative charge will not be deemed exhausted.[3]

In her amended complaint, Williams stated that she filed a claim with the EEOC on June 26, 2019. (1AC ¶ 48). Verizon has introduced as evidence a Charge signed by Williams dated June 26, 2019. (DE 36-4). Plaintiff does not dispute that this Charge is the same document referenced in her complaint. Nor does she dispute that the Right-to-Sue Letter Verizon has introduced relates to that Charge.

The Right-to-Sue Letter was issued on July 16, 2019, yet Plaintiff initiated this action on April 5, 2019. (DE 1). It is undisputed, therefore, that Plaintiff filed a federal lawsuit prior to being issued a Right-to-Sue Letter by the EEOC. As the Supreme Court plainly stated, a plaintiff may not bring a Title VII action prior to receiving a Right-to-Sue Letter. This fact means that Plaintiff

---

[3] The exhaustion requirement and the statute of limitations requirement are, of course, interrelated. If a claim has not been filed at all, then it has not been filed timely.

has failed to exhaust her administrative remedies, and cannot therefore access federal courts to adjudicate her claim. The same is true of her ADA claim.

Plaintiff has not responded to the motion to summary judgment. Had she responded, she might have called attention to the fact that while she initially filed a complaint before receiving the Right-to-Sue Letter, she did ultimately receive one. She makes no argument, however, that this fact somehow obviates the express requirement laid down by the Supreme Court.

Even if the belated receipt of a Right-to-Sue Letter allowed the claim to proceed, summary judgment would still be appropriate. That is because, as Verizon argues, a Right-to-Sue Letter only covers claims within the scope of the administrative charge.

### 2. Non-exhaustion of retaliation or disability discrimination

Verizon argues that none of the claims Williams now brings is covered by her Charge. To begin, Williams did not "check the box" on the Charge form for retaliation (Count 4) or discrimination on the basis of a disability (Count 9). Nor does her description of events hint at these claims.

A failure to check the box alleging retaliation, coupled with a failure to allege any retaliatory conduct in the Charge, means that Williams has not exhausted her administrative remedies as to the retaliation claim. *See Mandel v. M&Q Packaging Corp.*, 706 F. 3d 157, 164 (3d Cir. 2013) (holding that any claims alleging retaliation were barred because the plaintiff did not check the box for retaliation or describe any retaliatory conduct in the Charge). A review of the Charge here reveals that Williams neither checked the box nor described retaliation of any kind. The Charge describes conversations Williams was involved in, not retaliatory conduct. Even Bill Baske's statement that she "cannot retire" does not appear to be retaliation. As the Third Circuit has explained:

> A plaintiff seeking to establish a prima facie case of retaliation under Title VII must show: (1) that she engaged in a protected

> activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) "adverse action by the employer either after or contemporaneous with the employee's protected activity"; and (3) a causal connection between the protected activity and the adverse action.

*Moore v. Sec. U.S. Dept. of Homeland Security*, 718 F. App'x 164, 166 (3d Cir. 2017) (citing *Daniels v. Sch. Dist. of Phila.*, 776 F. 3d 181, 193 (3d Cir. 2015)).

Williams statements in the Charge do not encompass any engagement in a protected activity, whether formal or informal. It cannot reasonably be concluded from the Charge that Baske's statements regarding the retirement package were in retaliation for some action by Williams. Summary judgment is accordingly granted as to the retaliation claim (Count 4).

The same is true of the claim of discrimination on the basis of disability. Claims pursuant to the ADA are governed by the same procedure as Title VII claims. Williams did not check the box for disability discrimination, nor does she mention any disability or discrimination on that basis. Summary judgment is also granted as to the disability discrimination claim (Count 9).

### 3. Non-exhaustion of racial discrimination

The claims of racial discrimination, however, require further analysis. Williams did check the box for discrimination on the basis of race, and included a sentence in the Charge alleging that she has been the victim of racial discrimination. Verizon argues that this is not enough, and the claims of racial discrimination in the complaint are not fairly within the scope of the claims in the Charge.

Verizon cites to a case from this district that covered a similar situation. *Mohamed v. Atl. Cty. Special Servs.*, No. 17-03911, 2019 WL 1418123 (D.N.J. Mar. 29, 2019). In that case, the plaintiff noted in her charge that the defendant had retaliated against her on account of her race. Judge Kugler explained:

> From this statement, it could reasonably be inferred that the Charge alleges racial discrimination. This inference, however, does

13

> not allow Plaintiff to raise any and all discrimination and harassment claims. Those claims of racial discrimination and harassment within the Complaint must be related to, or grow out of, those within the Charge.
>
> The Amended Complaint appears to include instances of racial discrimination seemingly unrelated to the general and vague mention of race in the EEOC Charge.

*Id.* at *15-*16.

The Charge filed by Williams contains a similarly vague description of racial discrimination. The Charge relates two conversations: In one, her supervisor, Baske, says she cannot retire, and in the other, Melissa Finklin—whose job title is not identified—states that only foreigners or "illegals" "get everything." (DE 36-4). This could be interpreted very liberally as a claim that Williams was denied a retirement package, to which she would otherwise have been entitled, on account of her race.

Her amended complaint in this action, however, relates to completely different events. The Baske and Finklin conversations are not mentioned. Rather, the amended complaint describes a long-running pattern of perceived harassment by a number of co-workers and supervisors. Neither Bill Baske nor Melissa Finklin is mentioned by name. It is possible, I suppose, that Melissa Finklin is the individual referred to as "Missy" in the amended complaint, who subjected Williams to criticisms about "foreigners." But even if that were the case (and Williams, as discussed, has not responded that it is), both Melissa Finklin and Missy make comments relating only to national origin, not race.

Any investigation into the Charge would focus on the events described therein, none of which is repeated in the complaint. Nor do the events in the Charge bear any reasonable relation to the events described in the amended complaint, other than the conclusory reference to racial discrimination. For that reason, the claims Ms. Williams now brings are not fairly within the scope of the Charge.

14

As in *Mohamed*, the mere mention of racial discrimination in the charge is not an empty vessel into which any and all allegations of racial discrimination may be poured. The racial discrimination alleged in the court complaint is not reasonably within the scope of the allegations in the Charge. Accordingly, Williams has not exhausted her administrative remedies as to the claims of racial discrimination encompassed in Counts 1 and 3 of her amended complaint.

### 4. Williams's response

Williams's only response is to repeat the arguments she raised in her opposition to the motion to dismiss. (DE 39 at 17).

One such argument is that the administrative exhaustion requirement cannot be raised at the motion to dismiss stage. I have permitted the filing of a motion for summary judgment, giving both sides the opportunity to marshal the facts surrounding exhaustion of claims. So the availability, or not, of the failure-to-exhaust defense at the motion to dismiss stage is irrelevant.

Williams next argues that "[a]s Plaintiff William's filing is timely, the defense of failure to exhaust is inapplicable, because the statute of limitations will not function to bar Plaintiff Williams' timely filed charge of discrimination." (*Id.*). Whether or not her charge was timely filed, Williams makes no argument that her current claims of discrimination are within the scope of the claims of the Charge. They therefore do not relate back to the date of filing of the charge. Nor can she point to any evidence that her claim was in fact timely filed; Verizon has put forth evidence that it was not.

Williams also argues that filing a charge with the EEOC is not mandatory. (DE 39 at 24). That is incorrect, as her citation to *Fort Bend* confirms. *Fort Bend*, 139 S. Ct. at 1849 (holding that even though the charge filing requirement is a claim-processing rule, "[a] claim-processing rule may be mandatory in that sense that a court must enforce the rule if

15

a party properly raises it."). Verizon has raised the rule, and Plaintiff does not offer any valid reason that it should not apply in this instance.

Verizon has put forth evidence that Williams did not exhaust her administrative remedies. Evidence shows that Williams did not receive a Right-to-Sue Letter from the EEOC prior to filing her complaint and that the claims made in her amended complaint are not fairly within the scope of the Charge filed with the EEOC. Williams does not present any facts or arguments to raise a genuine dispute that she did in fact fail to exhaust her administrative remedies. Accordingly, summary judgment is appropriate as to her claims of retaliation, disability discrimination, and racial discrimination.

## CONCLUSION

For the foregoing reasons, Defendant Verizon's motion for summary judgment is **GRANTED** as to Counts 1, 3, 4, and 9.

Dated:  October 26, 2020

/s/ Kevin McNulty
_____
**HON. KEVIN MCNULTY, U.S.D.J.**